[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 718 
On March 9, 1993, Eddie Sanders filed a complaint in the Madison County Circuit Court against Dunlop Tire Corporation, seeking workers' compensation benefits. Sanders alleged that on April 22, 1992, and on June 19, 1992, he had suffered injuries to his right arm, wrist, and fingers, and that those injuries arose out of and in the course of his employment with Dunlop. He also alleged that on January 27, 1993, he had suffered an injury and/or occupational disease that arose out of and in the course of his employment with Dunlop. Sanders further alleged that Dunlop had had actual knowledge of his injuries, and that as the result of his injuries he had sustained a permanent disability. On March 24, 1993, Dunlop answered, denying the material allegations of the complaint and alleging that Sanders had had pre-existing infirmities, a disease, or a physical condition that barred his recovery of compensation benefits.
Following an ore tenus proceeding on December 20, 1994, the trial court entered a judgment on March 16, 1995, stating, in pertinent part:
"FINDINGS OF FACT
". . . .
 "6. That following the first accident to [Sanders's] right hand on April 22, 1992, [Sanders's] hand was shown on X-ray not to be fractured or dislocated. Dr. Howard Miller treated the injury conservatively and gave his opinion that [Sanders] could *Page 719 
return to his job at Dunlop with no restrictions and no permanent physical impairment.
 "7. That [Sanders's] second accident on June 19, 1992, was a hyperextension of his right wrist for which Dr. Miller performed a carpal tunnel release procedure on December 14, 1992. Dr. Miller also concluded thereafter that [Sanders] had no permanent restrictions or physical impairment from this injury. Dr. Joseph Clark later ordered EMG studies and X-rays for [Sanders], but they were interpreted as normal.
 "8. The Court finds that neither the right hand injury of April 22, 1992, nor the wrist injury and right carpal tunnel syndrome from the accident of June 19, 1992, caused [Sanders] any permanent partial disability or permanent loss of earning capacity and that [Sanders] is entitled to no additional benefits as a result of those two injuries.
 "9. That on or about January 29, 1993, and prior thereto, [Sanders] complained of skin rashes due to exposure to certain rubberrelated substances at Dunlop for which he received treatment from Dr. Sharon Gardepe. In January 1993, [Sanders] advised Dr. Gardepe that he felt he could not continue to work at Dunlop due to his recurring dermatitis. On April 26, 1993, [Sanders] submitted an application for disability retirement from Dunlop which was later granted and effective July 1, 1993, he became entitled to receive $1,241.65 in medical disability benefits. Said benefits are payable to [Sanders] until age 65.
 "10. That Ms. Patsy Bramlett, [Sanders's] vocational expert, gave an opinion that [Sanders] sustained a 70-75% loss of earning capacity based on [Sanders's] dermatitis in his working environment. Ms. Jane Roberts, [Dunlop's] vocational expert, concluded that [Sanders's] physical capabilities, age, and education would qualify him for many jobs that did not require him to be exposed to rubber-related substances. Ms. Roberts concluded [Sanders] experienced a vocational loss of 26%.
 "11. That based upon [Sanders's] intermittent skin condition of contact dermatitis on or about January 29, 1993, [Sanders] has experienced a 26% decrease in his earning capacity.
 "12. That [Sanders] would be entitled to receive accrued permanent partial disability benefits of $159.88 per week ($921.93 AWW x 2/3 x 26%) for 75 weeks (weeks accrued from the day [Sanders] last worked for [Dunlop] on 9/30/93 to the date of judgment) in the amount of $11,991, of which [Sanders's] attorney would be entitled to a 15% attorney's fee — $1,798.65, leaving [Sanders] a net amount of $10,192.35. [Sanders's] attorney would be entitled to receive an additional 15% of the present value of [Sanders's] right to receive $159.88 per week for a remaining 225 weeks, or $4,794.70 (15% x 159.88 x 199.9292). This would reduce [Sanders's] future benefits to $138.57 for 225 future weeks.
 "13. Section 25-5-57(c)(1), Alabama Code, provides that in calculating the amount of workers' compensation due: (1) the employer may reduce or accept an assignment from an employee of the amount of benefits paid pursuant to a disability plan, retirement plan, or other plan providing for sick pay by the amount of compensation paid, . . . if and only if the employer provided the benefits or paid for the plan or plans providing the benefits deducted. Evidence was presented at trial that, effective July 1, 1993, [Sanders] has received or is entitled to receive $1,241.65 per month (or $286.53 per week) until age 65 from a medical disability retirement plan provided by [Dunlop]. [Dunlop] is therefore entitled to a setoff of $286.53 per week effective July 1, 1993, on the benefits awarded herein. The Court finds that [Sanders's] attorney fee is not reduced by the setoff for compensation due [Sanders].
"CONCLUSIONS OF LAW
 "Based on the Foregoing Findings of Fact, this Court concludes [Sanders] is entitled to recover from [Dunlop] for workers' compensation benefits under the law of the State of Alabama due to his dermatitis based on exposure to rubber products. Said award is subject to [Dunlop's] right to *Page 720 
a setoff for [Sanders's] other recovery from an employer-provided disability plan.
"FINAL JUDGMENT
 "It is therefore ORDERED, ADJUDGED, and DECREED by the Court that [Sanders] have and recover of [Dunlop] the following:
 "1. The accrued sum of $10,192.35 for permanent partial disability benefits from September 30, 1993, to the date of this judgment plus $138.57 per week for 225 consecutive future weeks.
 "2. [Sanders's] attorney shall receive a 15% attorney's fee of $1,798.65 based on the accrued benefits and an additional $4,794.70 based on the present value of future benefits for a total of $6,593.35 attorney's fees.
 "3. [Dunlop] is entitled to a complete setoff for the accrued and future compensation payable to [Sanders] in Paragraph 1 of the Judgment Entry because the weekly retirement disability benefits received by [Sanders] from the disability retirement plan effective July 1, 1993, ($286.53 per week) exceed the amount of weekly compensation benefits [Sanders] would be due from [Dunlop].
 "4. That [Dunlop] shall be and is hereby relieved from any and all liability to [Sanders] for workers' compensation benefits by reason of the incidents set out above, except for future medical expenses for which it may be liable under Section 25-5-77, Alabama Code, and except for payment of [Sanders's] attorneys' fees incurred in this action as provided in Paragraph 2 of the Judgment Entry."
Sanders appeals, raising five issues: (1) whether the trial court erred in finding that he had suffered a 26% decrease in earning capacity as a result of contact dermatitis; (2) whether the trial court erred in finding that his permanent partial disability benefits accrued on September 30, 1993; (3) whether the trial court erred in finding Dunlop was entitled to a complete setoff of the accrued and future compensation payable to Sanders; (4) whether the trial court erred in finding that his wrist injury and right carpal tunnel syndrome did not result in any permanent partial disability or loss of earning capacity; and (5) whether the trial court erred in finding that he was entitled to only future medical expenses.
 The 26% Decrease in Earning Capacity
Sanders's inability to continue working for Dunlop resulted from his contact dermatitis, which occurred after August 1, 1992. Therefore, the new Workers' Compensation Act is controlling as to this claim. Our standard of review was changed by the new act. § 25-5-81(e), Ala. Code 1975. Under the new standard of review,
 "[w]e will view the facts in the light most favorable to the findings of the trial court. The trial court's judgment will not be reversed unless it is clear that the trial court's findings are manifestly contrary to the evidence as contained in the record as a whole or unless it is clear that fair-minded persons in the exercise of impartial judgment would adopt a contrary conclusion."
Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App. 1994).
Sanders was born on November 26, 1950; he graduated from high school on May 24, 1970; and he began working for Dunlop as a stock trucker on June 8, 1970. Sanders began having rashes on his scalp, arms, and legs in 1988; those rashes were determined to be contact dermatitis. Sanders, on the recommendation of his treating dermatologist, Dr. Sharon Foster Gardepe, ceased working for Dunlop on January 29, 1993.
Dr. Gardepe and Dr. Joseph Fowler, a dermatologist subspecializing in occupational dermatology cases, gave undisputed testimony indicating that Sanders's contact dermatitis resulted from an allergy to rubber and that Sanders's condition was permanent. Both doctors testified that Sanders should avoid all possible contact with rubber and recommended that Sanders not return to work for Dunlop or in the rubber industry.
Sanders submitted a vocational evaluation report prepared by Patsy V. Bramlett, a certified vocational rehabilitation counselor, to the trial court. Bramlett's report states *Page 721 
that Sanders fell in the average range of intellectual functioning; that Sanders has a 7th-grade reading level, a 6th-grade spelling level, and a 7th-grade arithmetic level; and that these scores are reliable and valid. Bramlett's report also details Sanders's work history at Dunlop's plant. Bramlett concluded that Sanders had a 60-65% loss of earning capacity, that he had a 56% loss of access to jobs, and that he had a 61-65% vocational disability rating.
Dunlop submitted to the trial court a vocational disability evaluation report prepared by Jane V. Roberts; Ms. Roberts is a branch manager of Crawford Company, a licensed professional counselor, and an attorney. Roberts's report indicates that Sanders has a high school reading level, a 5th-grade spelling level, and a 7th-grade arithmetic level. Roberts concluded that before he was injured Sanders had access to 3% of the jobs on the open labor market, and that after his injury and with the restriction against lifting over 20 pounds with his right hand, Sanders has access to approximately 2.5% of the jobs on the open labor market. She also concluded that Sanders has a 35% loss of earning capacity, that he has a 15% loss of access to jobs, and that he had an overall vocational loss of 26%.
A trial court has considerable discretion in determining an employee's loss of earning capacity and "may consider such factors as age, education, past work history, and the effect of the injury." Paschel v. Emro Marketing Co., 632 So.2d 971, 973
(Ala.Civ.App. 1993); Alabama Power Co. v. Wagnon,627 So.2d 977 (Ala.Civ.App. 1993).
After carefully reviewing the record, we conclude that that portion of the trial court's judgment finding that Sanders had suffered a 26% loss of earning capacity is not manifestly contrary to the evidence as contained in the record as a whole.
 Accrual of Permanent Partial Disability Benefits
Both Sanders and Dunlop cite § 25-5-117(b), Ala. Code 1975, in support of their arguments regarding the date they claim Sanders was last exposed to rubber. Sanders argues that his final exposure was January 29, 1993, before he was medically restricted from working for Dunlop. Dunlop argues that Sanders's last exposure was September 30, 1993, the last day he worked for Dunlop.
Both Sanders and Dunlop presume that Sanders suffers from an occupational disease; however, the trial court found that Sanders had developed "a skin allergy to rubber products" on January 29, 1993, and that he had been advised not to continue working for Dunlop because of his recurring contact dermatitis. Therefore, we conclude that Sanders's contact dermatitis was an "accident" within the meaning of the Workers' Compensation Act and that recovery was proper under the "accident provisions of the act." Gattis v. NTN-Bower Corp., 627 So.2d 437
(Ala.Civ.App. 1993). Therefore, the "date of last exposure" test of §25-5-117(b) does not apply.
Sanders, on the recommendation of Dr. Gardepe, ceased working for Dunlop on January 29, 1993, and on September 30, 1993, Sanders returned, at Dunlop's request, to Dunlop's plant to work as an office clerk. Sanders testified that Dunlop made him return to work on September 30, 1993, and that he worked only two or three hours before the company doctor sent him home because of a reoccurrence of his contact dermatitis. Had Sanders refused Dunlop's offer of employment as an office clerk he could have invalidated his eligibility for workers' compensation benefits. § 25-5-57(a)(3)e., Ala. Code 1975. Although Sanders attempted to return to work for Dunlop on September 30, 1993, the accident that resulted in his contact dermatitis had occurred on January 29, 1993. Consequently, we conclude that the trial court erred by calculating Sanders's accrued permanent partial disability benefits from September 30, 1993. We reverse that portion of the judgment awarding Sanders permanent partial disability benefits for his contact dermatitis from September 30, 1993, and we instruct the trial court to calculate Sanders's permanent partial disability benefits for his contact dermatitis from January 29, 1993. *Page 722 
 Setoff of Accrued and Future Compensation
Pursuant to § 25-5-57(c)(1), Ala. Code 1975, the trial court's March 16, 1995, judgment granted Dunlop a complete setoff of Sanders's accrued and future permanent partial disability benefits because Sanders was entitled to receive $1,241.65 per month from a medical disability plan. Section 25-5-57(c)(1) provides:
 "The employer may reduce or accept an assignment from an employee of the amount of benefits paid pursuant to a disability plan, retirement plan, or other plan, providing for sick pay by the amount of compensation paid, if and only if the employer provided the benefits or paid for the plan or plans providing the benefits deducted."
Sanders argues that Dunlop was not entitled to a setoff, because, he says, the record is devoid of any evidence that Dunlop had paid him any disability benefits, and the medical disability plan, which will provide him benefits, was not paid for by Dunlop, but was a fringe benefit provided in lieu of wages.
Dunlop, citing Scriven v. Industrial Commission, 736 P.2d 414
(Colo.Ct.App. 1987), argues that it was entitled to the setoff because, Dunlop says, it finances the plan that will pay Sanders's disability benefits. Dunlop contends that this court should follow the decision of the Colorado Court of Appeals inScriven, supra, and affirm the judgment of the trial court.
However, we note that Colorado's statutory provision for setoffs, C.R.S. § 8-42-103, mandates a reduction in an employee's compensation benefits by the amount or the percentage of the employer's contribution to the disability plan or retirement plan. That section also mandates that an employee's compensation benefits be reduced by an amount equal to 50% of the Social Security benefits that the employee receives. C.R.S. § 8-42-103(1)(c)(I). Consequently, we do not find the decision of the Colorado Court of Appeals in Scriven,supra, persuasive.
A jurisdictional survey of workers' compensation statutes reveals that unlike many statutes, § 25-5-57(c)(1) does not mandate an automatic setoff of benefits paid pursuant to a disability plan, retirement plan, or other plan providing for sick pay. See Alaska Stat. § 23.30.225(c); Ill.Ann. Stat. ch. 40, para. 5/14-129; Iowa Code § 85.38; La.Rev.Stat. Ann. §23:1225; Me.Rev.Stat.Ann. tit. 39-A § 221; Mich.Comp. Laws §418.354; N.Y. Work Comp. § 206.
In this case, the validity of the setoff turns on whether Dunlop "provided [Sanders's] benefits or paid for the plan" that provides Sanders's medical disability retirement benefits.
Sanders, citing Ex parte Murray, 490 So.2d 1238 (Ala. 1986), argues that he paid for the medical disability retirement plan, because, he says, the plan was part of his fringe benefits resulting from the collective bargaining agreement between Dunlop and Dunlop's employees, and because, he says, fringe benefits were a part of his earnings.
Our supreme court has held that under § 25-5-57(b), Ala. Code 1975, employer-paid fringe benefits "constitute 'allowances of any character' and are includable in the computation of the employee's average weekly wage." Murray, 490 So.2d at 1241. The evidence reflects that the medical disability retirement plan was part of Sanders's fringe benefits; that the fringe benefits were paid in lieu of wages; that in 1992 Sanders's fringe benefits cost $3.03 per hour; and that in 1993 Sanders's fringe benefits cost $3.54 per hour. Therefore, we conclude that Sanders paid for the medical disability retirement plan by accepting the fringe benefits in lieu of additional wages of $3.03 and $3.54 per hour. Murray, supra. Consequently, we conclude that the trial court erred by offsetting Sanders's medical disability retirement benefits against his accrued and future permanent partial disability benefits, and we reverse that portion of the judgment offsetting Sanders's medical disability retirement benefits against his accrued and future permanent partial disability benefits.
 Lack of Permanent Partial Disability From Wrist Injury
On April 22, 1992, Sanders suffered a crush injury of his right hand, wrist, and arm, and on June 19, 1992, Sanders hyperextended *Page 723 
his right hand, wrist, and arm. Therefore, Sanders's injuries to his right hand, wrist, and arm are governed by the two-step standard of review set forth in Ex parte Eastwood Foods,575 So.2d 91 (Ala. 1991).
Initially, this court must determine if there is any legal evidence to support the trial court's findings; if such evidence is found, then this court must determine whether any reasonable view of that evidence supports the judgment of the trial court. Id. However, this standard of review is applicable to the trial court's findings of fact and not its conclusions of law. Ex parte Cash, 624 So.2d 576 (Ala. 1993). Furthermore, our supreme court has held: "Where one reasonable view of the evidence supports the trial court's judgment, the judgment must be upheld, even if another, perhaps better reasoned, view of the evidence might have dictated a different outcome." Ex parteVeazey, 637 So.2d 1348, 1349 (Ala. 1993).
Sanders contends that he suffered a permanent disability as a result of his April 22 and June 19, 1992, injuries to his right hand, wrist, and arm, and that, pursuant to §25-5-57(a)(3)d., Ala. Code 1975, he is entitled to compensation for his injuries. Dunlop contends that Sanders did not suffer any permanent impairment as a result of his injuries and that this court should affirm the trial court's judgment holding that Sanders suffered no permanent disability or loss of earning capacity, because, Dunlop says, there is evidence to support the finding of the trial court.
Section 25-5-57(a)(3)d. states, in pertinent part:
 "For permanent disability due to injury to a member resulting in less than total loss of use of the member not otherwise compensated in this schedule, compensation shall be paid at the prescribed rate during that part of the time specified in the schedule for the total loss or total loss of use of the respective member which the extent of the injury to the member bears to its total loss."
"[W]e note that in regard to loss of, or loss of use of, a scheduled member, the loss of wages or earning ability is not directly concerned in determining compensation." Patrick v.FEMCO Southeast, Inc., 565 So.2d 644, 645 (Ala.Civ.App. 1990).
Sanders testified that he did not have any medical problems or problems with his right arm before he went to work for Dunlop. He testified that on April 22, 1992, he was scraping out "interlining behind the Gum Calender," when a piece of rubber wrapped around his right arm and pulled his arm into the rubber and into the mill. Sanders testified that he had to hit the safety switch and shut down the mill so that he could get his arm out. He testified that the mill "mashed my arm from the elbow down to my fingers," and that he went to the nurse and reported his injury to the nurse. Sanders was not paid any workmen's compensation benefits for his April 22, 1992, injury.
Sanders injured his right wrist on June 19, 1992, when his supervisor moved a hoist toward a roll of rubber that he was holding with his left hand, and the hoist caught and pinned his right hand, wrist, and arm backwards between the roll of rubber and a wall. Dr. Howard Miller performed a carpal tunnel release on his right wrist, and Sanders returned to work in January 1993. Sanders was paid four weeks of workmen's compensation benefits because of his June 19, 1992, injury and the carpal tunnel release. Sanders testified that he still has numbness in his right wrist; that the numbness goes down his wrist to "his pinky finger and the next finger"; that he has a "trigger thumb"; that his thumb "locks up"; that his right wrist stays sore; and that he does not have the "grip" in his right hand that he had before he had the carpal tunnel release.
On cross-examination, Sanders testified that after his April 22, 1992, injury his hand was X-rayed; that the X-ray did not show any fractures or dislocations; and that he returned to work without any restrictions. He also testified that his June 19, 1992, injury was a hyperflexion of his right wrist, and that Dr. Miller performed surgery on his wrist in December 1992. Sanders testified that Dr. Miller recommended that he see Dr. *Page 724 
Joseph William Clark, an orthopedic surgeon and an associate of Dr. Miller. He testified that he still had weakness in his right hand, that Dr. Clark did an "EMG" study on his wrist, and that the results of the study were negative.
Dr. John Bacon, an orthopedic surgeon, testified by deposition that he had seen Sanders before and after his carpal tunnel release, and that after the release, Sanders continued to complain of weakness and some numbness, tingling, and burning pain in his hand and wrist. He testified that assigned Sanders a permanent partial impairment rating of 5% to the right upper extremity, or 3% to the body as a whole. Dr. Bacon also testified that he placed permanent restrictions on Sanders, and that those restrictions were no repetitive use of his right hand and no gripping or lifting more than 20 pounds using his right hand.
On cross-examination, Dr. Bacon testified that his assignment of the permanent partial impairment rating and his placement of restrictions on Sanders were based on Sanders's complaints, and that he would assign a 5% permanent partial impairment rating after any carpal tunnel release even it there had been complete relief, because a carpal tunnel release leaves a weakness in the grip strength in the patient's arm.
Dr. Joseph William Clark, an orthopedic surgeon and an associate of Sanders's treating orthopedic surgeon, Dr. Howard Miller, testified by deposition that Dr. Miller found that Sanders had two distinct injuries to his right hand. Dr. Miller attributed Sanders's weakness of grip and numbness of the ulnar aspect of his fingers to Sanders's initial injury, a crush injury. Dr. Miller found that Sanders's second injury was a hyperextension of his right wrist.
Dr. Clark testified that Dr. Miller performed a right carpal tunnel release on Sanders. He also testified that in an April 22, 1993, letter to Dunlop's workmen's compensation carrier, Dr. Miller wrote that Sanders had reached maximum medical improvement following his carpal tunnel release and that Sanders did not have any permanent impairment as a result of the carpal tunnel release. Dr. Clark further testified that Dr. Miller also wrote that he had not determined if Sanders had any permanent impairment from "his other hand problems."
Dr. Clark testified that Dr. Miller asked him to see Sanders because of Sanders's continued upper hand weakness after the carpal tunnel release. Dr. Clark examined Sanders and found that Sanders did have weakness in the small muscles of his right hand. Dr. Clark testified that he felt Sanders had ulnar nerve neuropathy and sent Sanders to a neurologist for a nerve conduction study; however, the study failed to demonstrate any ulnar nerve neuropathy. Dr. Clark testified that Sanders continued to complain of numbness and weakness in his right hand and that he felt that Sanders had ulnar nerve neuropathy but that he was not able to objectively demonstrate that Sanders had that condition.
On cross-examination, Dr. Clark testified that Sanders's problems with his right wrist were consistent and compatible with Sanders's April 22, 1992, crush injury, and that Sanders was not faking the numbness and weakness in his right hand.
We note that the trial court is not bound by expert testimony. Malone v. Con-Agra Poultry, Inc., 595 So.2d 897
(Ala.Civ.App. 1992). However, it is apparent from the March 16, 1995, judgment that the trial court did consider Dr. Clark's expert testimony. In its March 16, 1995, judgment, the trial court stated that Dr. Miller did not place any permanent physical impairment on Sanders as a result of his April 22, 1992, injury. However, this finding is inconsistent with Dr. Clark's deposition testimony. Dr. Clark testified that Dr. Miller determined that Sanders did not have any permanent impairment as a result of the carpal tunnel release, but that Dr. Miller did not determine if Sanders had any permanent impairment from "his other hand problems." Therefore, we conclude that Dr. Miller did not determine if Sanders had suffered any permanent partial impairment as result of his April 22, 1992, injury.
"An injured employee's own subjective complaints of pain are legal evidence which may support a finding of disability." *Page 725 Jim Walter Resources, Inc. v. Budnick, 619 So.2d 926, 927
(Ala.Civ.App. 1993). Therefore, Sanders's subjective complaints of numbness and soreness in his right hand and of weakness in the grip of his right hand were legal evidence of a disability. Consequently, we conclude that the trial court erred in denying Sanders workmen's compensation benefits under §§25-5-57(a)(3)a. and 25-5-57(a)(3)d. for his April 22, 1992, injury.
 Future Medical Expenses
Sanders contends that he is entitled to the benefits provided in § 25-5-77, Ala. Code 1975, including expenses for medical and surgical treatment; vocational rehabilitation; physical rehabilitation; medicine and medical and surgical supplies; and a medical examination review and a decision or recommendation by an ombudsman involving "medical practice." Dunlop contends that the trial court did not err in failing to make a finding regarding Sanders's entitlement to vocational rehabilitation or other benefits under § 25-5-77, because, Dunlop says, Sanders did not raise this issue before the trial court and failed to present any evidence regarding his entitlement to any other benefits.
Section 25-5-77(c) provides, in pertinent part,
 "If an employee who is unable in the opinion of the treating physician to return to his or her former employment shall request vocational rehabilitation and if both a vocational rehabilitation specialist and a treating physician, the cost of whose service is the obligation of the employer under this section, shall express their opinions in writing that in the judgment of each of them vocational rehabilitation is reasonably calculated to restore the employee to gainful employment and is in the best interest of the employee, the cost of rehabilitation shall be borne by the employer."
The record is devoid of any writing from Sanders's treating physicians stating that, in his or her opinion, vocational rehabilitation was in Sanders's best interests and was reasonably calculated to restore Sanders to gainful employment. Sanders's vocational rehabilitation expert, Bramlett, wrote that she had recommended that Sanders apply with the State Adult Vocational Rehabilitation Service for assistance with vocational retraining and job placement. Consequently, we conclude that Sanders failed to present substantial evidence that he was entitled to vocational rehabilitation.
Further, this court has held that "[o]nce a trial court determines that a claimant has sustained a physical disability, then such determination carries with it as a matter of law that the employer must pay all future medical expenses which are reasonable and necessary for the treatment of such injury."Raines v. Browning-Ferris Industries, 638 So.2d 1334, 1337
(Ala.Civ.App. 1993). Therefore, Dunlop is responsible for any medical and surgical treatment and medicines that are reasonable and necessary for the treatment of Sanders's compensable injuries. Additionally, we note that when there is a dispute regarding medical services provided by a physician, pursuant to § 25-5-77(i)(5) either party may request that an ombudsman consult with an independent medical expert for the purpose of consultation and advice in resolving any issue involving medical practice. Consequently, the judgment of the trial court does not prohibit Sanders from utilizing §25-5-77(i)(5) if the issue arises. Accordingly, we cannot say that the trial court erred by not ordering Dunlop to pay for vocational rehabilitation for Sanders.
Based on the foregoing, we affirm that portion of the trial courts' judgment finding that Sanders was entitled to only future medical expenses, and that portion of the trial court's judgment awarding Sanders a 26% loss of earning capacity as a result of his contact dermatitis. We reverse those portions of the judgment awarding Sanders permanent partial disability benefits, as a result of his contact dermatitis, beginning September 30, 1993; awarding Dunlop a complete setoff of Sanders's accrued and future permanent partial disability benefits; and finding that Sanders had not suffered any permanent disability as a result of his April 22, 1992, injury. This cause is remanded to the trial court for further proceedings. *Page 726 
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
YATES, J., concurs.
MONROE, J., concurs in the result.
THIGPEN, J., concurs in the result only.
CRAWLEY, J., concurs in part and dissents in part.